Argued and submitted November 8, 2007, affirmed March 26,
petition for review allowed August 6, 2008 (345 Or 175)
See later issue Oregon Reports

George WHITE,
*Plaintiff-Respondent,*

*v.*

JUBITZ CORPORATION,
an Oregon corporation,
dba Ponderosa Lounge,
*Defendant-Appellant.*

Multnomah County Circuit Court
040302468; A128617

182 P3d 215

Michael T. Stone argued the cause and filed the briefs for appellant.

Mark McDougal argued the cause for respondent. With him on the brief was Gregory Kafoury.

Charles Robinowitz filed the brief *amicus curiae* for Oregon Trial Lawyers' Association.

Before Haselton, Presiding Judge, and Brewer, Chief Judge, and Armstrong, Judge.

ARMSTRONG, J.

## ARMSTRONG, J.

In this personal injury case, defendant appeals from a judgment awarding plaintiff the full value of his medical expenses, including the portion of those expenses that were "written off" by plaintiff's medical providers under an agreement with Medicare. We affirm.

The facts are undisputed. Plaintiff, a patron at defendant's establishment, sustained injuries when the bar stool on which he was sitting collapsed under him. Plaintiff received medical treatment for his injuries, for which medical providers billed him a cumulative amount of $38,977. However, because plaintiff had Medicare coverage, his medical providers subsequently "wrote off" $25,551 of those expenses as a condition of their agreement to accept Medicare payments. Medicare then paid the remaining $13,426, thus discharging plaintiff's obligation to pay his medical providers.

Plaintiff filed a negligence action against defendant that sought economic and noneconomic damages for the injuries that plaintiff had sustained. Before trial, defendant made a motion *in limine* asking the court either (1) to exclude evidence of the expenses that had been written off, that is, to limit plaintiff's recoverable economic damages to the $13,426 that Medicare had paid to the medical providers, or (2) to allow defendant to present evidence that portions of plaintiff's medical expenses had been written off. The court denied that motion but allowed defendant leave to submit a post-verdict motion regarding the expenses that had been written off.

After the jury returned a verdict awarding plaintiff economic damages totaling $37,600, which represented plaintiff's medical expenses without reduction for the Medicare write-offs, defendant filed a motion to reduce that amount by the portion of the expenses that the medical providers had written off. The court denied that motion, concluding that, under Oregon's collateral source statute, ORS 31.580(1)(d), Medicare write-offs are federal Social Security benefits that could not be deducted from plaintiff's economic damages.

On appeal, defendant assigns error to the trial court's denial of its motion *in limine* and its post-verdict motion to reduce the amount of recoverable medical expenses. In essence, defendant's assignments raise three interrelated questions: *First*, are billed amounts that a medical provider writes off pursuant to an arrangement with an insurer (write-offs) recoverable "economic damages," as defined by ORS 31.710(2)(a)? *Second*, if those write-offs are recoverable economic damages, are they also collateral benefits under ORS 31.580(1) by which a court may reduce a damage award? And, *third*, if ORS 31.580 applies, are Medicare write-offs nonetheless encompassed within the exceptions listed in ORS 31.580(1)(a) through (d) such that a court may not reduce a damage award by the amount of those benefits? For the reasons explained below, we conclude that (1) write-offs are recoverable economic damages as defined by ORS 31.710(2)(a); (2) those write-offs are "collateral benefits" as defined by ORS 31.580(1); but (3) write-offs resulting from Medicare coverage are "federal Social Security benefits" under ORS 31.580(1)(d), and are thus exempt from being used by a court to reduce a damage award.

All three questions involve the construction of statutes. In construing a statute, our task is to effectuate the intent of the legislature. *PGE v. Bureau of Labor and Industries*, 317 Or 606, 611, 859 P2d 1143 (1993). We look first to the text of the statute in context. If our first-level analysis indicates that the relevant statutory language is ambiguous, then we explore the legislative history, and, if necessary, canons of construction. *Id.* at 611-12.

Thus, with regard to the first question—whether write-offs are recoverable economic damages as defined by ORS 31.710(2)(a)—we begin our inquiry with an analysis of the text of ORS 31.710(2)(a) in context. ORS 31.710, which the 1987 legislature adopted as part of an extensive tort reform package,[1] sets out the standards for economic and noneconomic damages that a plaintiff may recover in a civil

---

[1] Or Laws 1987, ch 774, § 6. ORS 31.710 and ORS 31.580 were originally enacted as *former* ORS 18.560 and *former* ORS 18.580, respectively, and were renumbered in 2003 without substantive changes. Unless noted otherwise, we refer to the statutes by their current numbers.

action. *Benjamin v. Wal-Mart Stores, Inc.*, 185 Or App 444, 472, 61 P3d 257 (2002), *rev den*, 335 Or 479 (2003). As is relevant here, ORS 31.710(2)(a) defines economic damages as

> "objectively verifiable monetary losses including but not limited to *reasonable charges necessarily incurred for medical, hospital, nursing and rehabilitative services and other health care services*, burial and memorial expenses, loss of income and past and future impairment of earning capacity, reasonable and necessary expenses incurred for substitute domestic services, recurring loss to an estate, damage to reputation that is economically verifiable, reasonable and necessarily incurred costs due to loss of use of property and reasonable costs incurred for repair or for replacement of damaged property, whichever is less."

In contrast, noneconomic damages consist of "subjective, nonmonetary losses" such as those for pain, suffering, and emotional distress, among other things. ORS 31.710(2)(b).

Our initial focus centers on whether write-offs are "objectively verifiable monetary losses" that are "reasonable charges necessarily incurred" by a plaintiff. The key term here is "incurred." Defendant urges us to define "incur" as used in ORS 31.710(2)(a) to mean "paid or remains liable to pay." By defendant's reasoning, a plaintiff's economic damages are only those charges that the plaintiff paid or remains liable to pay *at the time of trial*, and thus must exclude the amount that the plaintiff's medical providers wrote off. Plaintiff, in response, argues that a plaintiff incurs damages when the plaintiff becomes "liable [or] subject to" charges, that is, *at the time of treatment*. We agree with plaintiff.

The legislature does not explicitly define the word "incur" as used in ORS 31.710(2)(a). Absent such a definition, we presume that the legislature intends that words of common usage to be given their ordinary meaning. *PGE*, 317 Or at 611. The common meaning of "incur," as defined in *Webster's* and as we have previously recognized, is to "become liable or subject to." *Webster's Third New Int'l Dictionary* 1146 (unabridged ed 2002); *see PGE v. Jungwirth Logging, Inc.*, 151 Or App 789, 794, 951 P2d 1101 (1997), *rev den*, 327 Or 432 (1998); *King v. AFSD*, 142 Or App 444, 448, 921 P2d

1326 (1996).[2] "Necessarily," an adverb, modifies "incurred" and reflects on the necessity of the treatment that results in charges, implying that charges are incurred when a plaintiff receives necessary treatment. Thus, read together, the phrase "reasonable charges necessarily incurred" is most sensibly understood to mean charges to which an injured party becomes *subject* at the time that the party receives care necessary to treat the party's injuries.

The context of ORS 31.710 supports our conclusion. We find relevant statutory context in the preexisting common law and in the statutory framework within which the statute was enacted. *Fresk v. Kraemer*, 337 Or 513, 520-21, 99 P3d 282 (2004).

At common law, as under ORS 31.710, a plaintiff could recover the costs of services necessarily incurred by the plaintiff as a result of a defendant's conduct. *Mathews v. City of La Grande*, 136 Or 426, 430, 299 P 999 (1931). The principle historically applied in Oregon has been consistent with the *Restatement* rule that medical expenses are not penny-for-penny, unreimbursed out-of-pocket costs to the plaintiff, but rather

> "the *value of services reasonably made necessary by the harm*. * * * The value of medical services made necessary by the tort can ordinarily be recovered although [those expenses] have created no liability or expense to the injured person, as when a physician donates his services."

---

[2] Defendant quotes our holding in *King* to support its proposed definition of incur, but that reliance is misplaced. In *King*, we addressed "incur" as it was used in ORS 416.540, which attached a statutory lien in favor of the Oregon Department of Human Services to a welfare recipient's tort recovery after deducting, among other things, "medical * * * expenses incurred" by the welfare recipient. 142 Or App at 446.

We concluded that, for purposes of ORS 416.540, the operative date for calculating medical expenses incurred by a welfare recipient was the date that the recipient settled a claim, based on that statute's context and history, which evidenced a legislative intention to relieve some of the burden on public assistance programs by allowing the state to assert liens against funds received by welfare recipients from tortfeasors. *Id*. at 449. Accordingly, we limited our holding in that case to the meaning of incur "[a]s used in ORS 416.540(2)," *id*., which does not bear on the meaning of incur here.

*Restatement (Second) of Torts* § 924(c) comment f (1979) (emphasis added). For example, Oregon courts have long held that a plaintiff seeking damages for medical expenses must establish the reasonableness of those expenses and cannot simply rely on a medical bill for that purpose. *See Tuohy v. Columbia Steel Co.*, 61 Or 527, 532, 122 P 36 (1912) ("The rule is that a plaintiff in a case involving personal injuries can recover, as a part of his damages, his reasonable expenses for medicines and medical treatment, but there must be some evidence that the charges are reasonable."); *Mathews*, 136 Or at 430 (applying rule). In other words, Oregon courts did not impose a quantum of proof on either party to show what had actually been paid but, rather, required proof that the amount billed for services was reasonable. To do that, a plaintiff generally presented evidence of the reasonableness and necessity of medical expenses through testimony of physicians and other medical professionals familiar with the injury, treatment, and costs involved. *See, e.g., id.; Valdin v. Holteen and Nordstrom*, 199 Or 134, 147-49, 260 P2d 504 (1953).

It was in light of that underlying law that the legislature enacted ORS 31.710, which provides a statutory rule of recovery for compensatory damages for bodily injuries caused by tortious conduct. *See DeVaux v. Presby*, 136 Or App 456, 461, 902 P2d 593 (1995). Our subsequent interpretation and application of the statute have been consistent with our preexisting treatment of economic damages for medical costs under the common law, to wit, recoverable damages are based, not on what a plaintiff personally paid, but on the *value* of necessary services. Further, we have continued to hold that a plaintiff seeking damages for medical expenses must establish the reasonableness of medical costs, through testimony or other evidence, beyond the existence of a medical bill. *See, e.g., Ellington v. Garrow*, 213 Or App 490, 496-97, 162 P3d 328 (2007); *Lea v. Farmers Ins. Co.*, 194 Or App 557, 559, 96 P3d 359 (2004) (discussing *Tuohy*, 61 Or at 532). In short, at common law and under ORS 31.710(2)(a), the quantum of proof required to recover medical expenses was merely the objective reasonableness of those expenses; neither at common law nor under the statute did the parties have to show that those expenses were *actually* paid or

billed.[3] Evidence of insurance and other third-party sources that may have reduced a plaintiff's out-of-pocket obligations has not been relevant to a jury's determination of a plaintiff's damages for necessary medical treatment.

As a practical matter, that conclusion appears to be the only plausible construction of ORS 31.710(2)(a). If the legislature intended "incurred" to mean only those medical charges that a plaintiff has paid or remains liable to pay at the time of trial, a jury's determination of damages for medical services incurred by the plaintiff would turn on timing. For example, a plaintiff's personal liability on a medical bill would vary greatly depending on whether, at the time of trial, the plaintiff or medical provider had submitted bills to the insurance provider, or whether the insurance provider had processed the bills and calculated the amounts that it would pay on the plaintiff's behalf. Similarly, determining the value of future medical services would become a difficult, if not impossible, task for a jury. Along with assessing the necessity and reasonableness of a plaintiff's future medical services, a jury presumably would also have to factor in whether the plaintiff would be covered by insurance for those future services and, if so, how much the medical provider would write off pursuant to that hypothetical coverage. The circumstances in this case are not unique: insurance programs, both private and publicly funded, commonly require medical providers to accept payments for less than the amounts that the providers have billed patients. In that sense, a trial to determine the damages to be awarded for medical services would become a trial of the entire health care system and how providers and insurers calculate and account for medical costs.[4]

---

[3] Indeed, a plaintiff need not even have received all of the necessary care nor have been billed for those services by the time of trial to have "incurred" expenses under ORS 31.710(2)(a). *See, e.g., Clarke v. OHSU*, 343 Or 581, 586, 175 P3d 418 (2007) (allowing recovery of future medical expenses); *Evers v. Roder*, 196 Or App 758, 760, 103 P3d 680 (2004) (same); *see also Kahn v. Pony Express Courier Corp.*, 173 Or App 127, 160-62, 20 P3d 837, *rev den*, 332 Or 518 (2001) ("reasonable and necessary expenses *incurred* for substitute domestic services," as it appears in ORS 31.710(2)(a), includes a child's future damages for loss of a mother's services).

[4] If a defendant is allowed to present evidence of write-offs, presumably the plaintiff would correspondingly seek to introduce evidence of the premiums or taxes he or she paid for the health coverage that led to the write-offs. Such an approach would almost inevitably reveal the extent of plaintiff's insurance coverage to the jury. *See Benton v. Johnson*, 45 Or App 959, 963, 609 P2d 890, *rev den*,

Indeed, the Supreme Court reached a similar conclusion in *Seibel v. Liberty Homes, Inc.*, 305 Or 362, 369, 752 P2d 291 (1988), in which it held that an employer's liability in a contract action was not reduced by the amount of Social Security disability payments received by a wrongfully discharged employee.[5] In reaching its conclusion, the court explained:

> "A trial of the employee's contract action should not be turned into a trial of the employee's potential claims for benefits from some administrative program, nor should the outcome depend simply on whatever cash benefits happen to have been paid before the trial.
>
> "It is argued that to disregard payments of social benefits in the action against the employer gives a successful plaintiff an unjustified windfall. But whether to save or recapture those costs is properly an issue between the provider of the benefits and its beneficiaries, a policy choice in the design of the program. Absence of a recoupment provision does not help the employer who causes the costs by improperly terminating the employee's regular source of compensation."

*Id.*

■■ In summary, we conclude that "reasonable charges necessarily incurred," as used in ORS 31.710(2)(a), are those charges to which a plaintiff becomes liable or subject when the plaintiff received treatment, without regard to amounts that a medical provider subsequently writes off.[6] Here, when he received treatment, plaintiff became subject to the full, billed amount of his medical costs; the fact that his Medicare coverage subsequently reduced his liability for those costs by the time of trial is inconsequential. Hence, the trial court did not err in denying defendant's motion *in limine* to limit plaintiff's evidence to the amount that Medicare paid on plaintiff's behalf or to permit defendant to introduce evidence of the amounts that were written off.

---

289 Or 373 (1980) (injecting evidence of insurance coverage is grounds for mistrial if prejudicial to plaintiff).

[5] Because *Seibel* was a contract, not tort, action, ORS 31.710 and ORS 31.580 did not apply.

[6] To avoid any misunderstanding, we note that the principle also applies to future medical expenses that a plaintiff will incur and, hence, can recover as economic damages.

Our second inquiry—whether written-off amounts for medical care are collateral benefits under ORS 31.580—is also one of statutory construction. Accordingly, we begin our analysis with the text of ORS 31.580 in context.

ORS 31.580 provides:

"(1)   In a civil action, when a party is awarded damages for bodily injury or death of a person which are to be paid by another party to the action, and the party awarded damages or person injured or deceased *received benefits for the injury or death other than from the party who is to pay the damages*, the court *may* deduct from the amount of damages awarded, before the entry of a judgment, the total amount of those collateral benefits other than:

"(a)   Benefits which the party awarded damages, the person injured or that person's estate is obligated to repay;

"(b)   Life insurance or other death benefits;

"(c)   Insurance benefits for which the person injured or deceased or members of that person's family paid premiums; and

"(d)   Retirement, disability and pension plan benefits, and federal Social Security benefits.

"(2)   Evidence of the benefit described in subsection (1) of this section and the cost of obtaining it is not admissible at trial, but shall be received by the court by affidavit submitted after the verdict by any party to the action."

(Emphasis added.) In short, ORS 31.580 permits but does not compel a court to reduce a plaintiff's damage award by the amount of "benefits" that the plaintiff receives from a third party for the plaintiff's injuries, unless an exclusion in paragraphs (a) through (d) applies. In addition, evidence of those benefits is inadmissible at trial.

Our inquiry turns on the meaning of the word "benefits." As a term of common usage, we give the word its common meaning, *Smurfit Newsprint Corp. v. Dept. of Rev.*, 329 Or 591, 597, 997 P2d 185 (2000), unless the legislature intended some other meaning, *see Wyatt v. Body Imaging, P.C.*, 163 Or App 526, 533, 989 P2d 36 (1999), *rev den*, 330 Or 252 (2000). To start, we note that ORS 31.580(1) creates, in a sense, two categories of benefits: (1) those "benefits for the

injury or death other than from the party who is to pay the damages" and (2) those benefits identified in paragraphs (a) through (d) of the statute that cannot be used by a court to reduce a plaintiff's damage award. Absent a specific definition of "benefits" as the term is used in the former category, the term appears to be partially defined by way of the exceptions listed in paragraphs (a) through (d).

Thus, we begin by looking at the term benefit in its common usage, and then refine that definition through the context of the enumerated benefits in paragraphs (a) through (d). *See Lane County v. LCDC*, 325 Or 569, 578, 942 P2d 278 (1997) ("[W]e do not look at one subsection of a statute in a vacuum; rather, we construe each part together with the other parts in an attempt to produce a harmonious whole.").

As a term of common usage, a relevant definition of benefits is "**3** **:** payment, gift: as **a** **:** financial help in time of sickness, old age, or unemployment * * * **c** **:** a cash payment or service provided for under an annuity, pension plan, or insurance policy[.]" *Webster's* at 204 (boldface in original). Thus, by its common usage, benefits need not be limited to cash payments made to a plaintiff. Rather, a benefit can take other forms, such as a "service," "gift," and "financial help."

Further, in the four exemptions delineated in paragraphs (a) through (d), the legislature provides some clues about the characteristics that it deemed collateral source benefits to share in common. We begin by noting certain characteristics to which benefits under ORS 31.580 are *not* confined. First, collateral source benefits are not solely payments that carry with them a right of subrogation or a right to a judgment lien in favor of a third party. Paragraph (a) provides for those sorts of benefits, whereas paragraphs (b) through (d) encompass benefits such as life insurance and pension plan benefits, which the plaintiff may or may not be required to repay. Thus, the fact that no lien attaches or subrogation right exists with respect to a particular benefit does not foreclose it from falling within ORS 31.580. Relatedly, because collateral source benefits are not limited to those benefits that a plaintiff must repay, the legislature contemplated that plaintiffs, at times, would receive a "windfall" or "double recovery"—that is, the benefit itself plus its value

paid by a defendant—depending on the benefit. So, a plaintiff's potential "double recovery" stemming from receipt of a third-party benefit does not foreclose it from qualifying as a collateral source benefit under ORS 31.580.

We then look to the text of the exceptions themselves to determine what the legislature determined definitively to be collateral source benefits. In particular, paragraph (c), which provides for "[i]nsurance benefits for which the person injured or deceased or members of the family paid premiums," is relevant to our analysis. There is no dispute that amounts that an insurer pays directly to a medical provider are collateral source benefits under paragraph (c). We cannot detect a relevant distinction between the manner in which the legislature intended to treat payments made by an insurer to a medical provider and amounts that are "written off" as a result of the plaintiff's medical coverage. The former is a payment made directly to the provider; the latter is an indirect benefit extended to the plaintiff in the form of a discharge of debt. Both forms of benefit come about as a result of a plaintiff paying premiums for insurance or otherwise being in a class that lawmakers deemed to be eligible to receive that benefit, and both, ultimately, are "benefits" to a plaintiff because they discharge an obligation that the plaintiff otherwise would have to pay the medical providers.

Indeed, in this case, defendant does not dispute plaintiff's right to recover the $13,426 that his insurer (Medicare) paid to his medical providers to cover the reduced charges for medical services.[7] However, but for his insurance coverage, plaintiff presumably would have been liable for the full, billed amount of $38,977 for his injuries. In other words, plaintiff was going to pay either nothing out of his own pocket as a result of his coverage, or $38,977 if he were uninsured. Nothing suggests that, had plaintiff lacked medical coverage, his medical bills would have totaled only the discounted amount of $13,426.

Hence, we conclude that the term "benefit" is unambiguous on that point; billed amounts later written off by a

---

[7] Additionally, Medicare has a right to reimbursement of the amount it pays on behalf of a beneficiary. 42 USC § 2651(a) (2000).

medical provider are collateral source benefits as contemplated by ORS 31.580.[8]

■ Our remaining inquiry focuses on whether Medicare write-offs are "federal Social Security benefits" under ORS 31.580(1)(d) that preclude the court from reducing plaintiff's award. We conclude that they are.

To start, a brief explanation of the Medicare program provides helpful context. Medicare was established as Title XVIII of the Social Security Amendments of 1965 and is operated under the purview of the Social Security Administration. Pub L 89-97, Title I, § 102(a), 79 Stat 291 (1965); ORS 743.680(3) (defining Medicare). Medicare is health insurance that is available to people who are age 65 or older, people under age 65 who suffer from particular types of disabilities, and those with end-stage renal disease. 42 USC § 1395c (2000). Medicare consists of several parts with varying levels and types of coverage. For example, Part A covers basic inpatient care in hospitals and certain hospice or home-nursing care. *Id.* § 1395d. Generally, Part A coverage is available free of monthly premiums to anyone who is 65 or over and who is otherwise entitled to receive federal Social Security benefits. *Id.* § 426(a). Those who are age 65 or older may apply for Part A coverage if they do not otherwise qualify for premium-free coverage. *Id.* § 1395i-2. Part B, in contrast, is a voluntary program that provides coverage for medically necessary outpatient care and preventative care. *Id.* §§ 1395j-1395k. Part B enrollees pay monthly premiums, coinsurance for certain services, and a yearly deductible. *Id.* §§ 1395j-1395*l*.

We begin our final exercise in statutory construction with, again, an analysis of the text in context. At first blush, it appears that the text "federal Social Security benefits" in paragraph (d) encompasses all programs stemming from the Social Security Act. No language specifically modifies "federal Social Security benefits" to suggest a legislative intent to limit that category to particular types of Social Security benefits, such as retirement, disability, or Medicare. To conclude that the legislature intended such a limit would appear to

---

[8] Accordingly, consistent with our conclusion on the first question that we addressed, 219 Or App at 70, evidence of write-offs is not admissible at trial for use in assessing economic damages. ORS 31.580(2).

require us to insert what has been omitted from the statute, which would violate the prohibition in ORS 174.010 against doing that. Further, standard rules of grammar support that interpretation. *See, e.g., State v. Webb,* 324 Or 380, 387-88, 927 P2d 79 (1996) (applying rules of grammar to statutory construction analysis). The series "[r]etirement, disability and pension plan benefits" forms one series of benefits separated by a comma and the word "and" from "federal Social Security benefits," thus indicating that the legislature did not intend for retirement, disability, and pension plan benefits to modify or form a continuous category with federal Social Security benefits.[9] *See State v. Kadin/Coleman,* 172 Or App 353, 358, 18 P3d 484, *rev den,* 332 Or 326 (2001) (ignoring a comma separating items in a series "and merging * * * two categories * * * overlooks [a] customary rule of grammar").

Arguably, however, if we were to consider each of paragraphs (a) through (d) as describing an individual category of exclusions, we might arrive at a different conclusion. Under the principle of *noscitur a sociis,* terms in a list are considered to share the same quality or common characteristics. *See State v. Moen,* 309 Or 45, 89 n 17, 786 P2d 111 (1990); *Johnson v. Employment Dept.,* 187 Or App 441, 450 n 4, 67 P3d 984, *rev den,* 336 Or 60 (2003). Here, federal Social Security benefits appear as an additional item within paragraph (d). One quality common to the other items in paragraph (d) "[r]etirement, disability and pension plan benefits"—is that those types of benefits replace or supplement an individual's income; thus, the legislature's inclusion of federal Social Security benefits in that paragraph could suggest that it intended those benefits to be restricted to only retirement- or disability-related Social Security benefits.

Nevertheless, we note that the second construction appears to be untenable. First, to adopt that construction would require us to ignore the initial serial grouping of "[r]etirement, disability and pension plan benefits," and punctuation separating it from "federal Social Security benefits." *See Brock v. State Farm Mutual Auto. Ins. Co.,* 195 Or

---

[9] Consider, for example, the subtle difference in meaning if paragraph (d) read: "Retirement, disability, pension plan and federal Social Security benefits."

App 519, 526, 98 P3d 759 (2004) ("[W]e do not construe statutes in a manner that is grammatically untenable."). Second, it is our goal in interpreting a statute to give effect to every provision of it. ORS 174.010; *State v. Connally*, 339 Or 583, 593, 125 P3d 1254 (2005). Here, the phrase "federal Social Security benefits" would be meaningless if construed to include only income-replacing benefits. For instance, the general terms "retirement" and "disability" are accounted for in paragraph (d), which apparently would encompass those same sorts of federal Social Security benefits. Additionally, death benefits listed in paragraph (b) would presumably encompass the federal Social Security benefits that pass to family members at a person's death. If the legislature intended "federal Social Security benefits" to add anything to the statute, then, it must have intended the phrase to encompass *all* federal Social Security benefits, not simply those otherwise listed in the statute.

Hence, we do not believe that the phrase "federal Social Security benefits" as used in ORS 31.580(1)(d) is ambiguous. Rather, it encompasses all benefits flowing from the Social Security program, including Medicare. A construction that limits those benefits to certain types of Social Security benefits is untenable even in light of the principle of *noscitur a sociis*. Therefore, we need not consider the legislative history and other maxims of construction. *See PGE*, 317 Or at 611-12 ("If, but only if, the intent of the legislature is not clear from the text and context inquiry, the court will then move to the second level, which is to consider legislative history to inform the court's inquiry into legislative intent.").[10]

In summary, we conclude that billed amounts later written off by a medical provider pursuant to an arrangement with the plaintiff's insurer are recoverable economic damages under ORS 31.710(2)(a). Further, those written-off amounts are collateral source benefits under ORS 31.580(1); however, Medicare write-offs are federal Social Security benefits under ORS 31.580(1)(d) and, accordingly, are exempt from post-verdict deduction by the court. Hence, the court did

---

[10] In all events, the legislative history relevant to this question is sparse and does not contradict our conclusion.

not err in denying defendant's motion *in limine* to limit plaintiff's evidence to evidence of collectible medical expenses or to present evidence to the jury of the amounts that plaintiff's medical providers had written off. Likewise, the court did not err in denying defendant's post-verdict motion to reduce the amount of damages awarded to plaintiff by the jury for medical expenses that plaintiff incurred.

Affirmed.